# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL J. RUDNICK, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| ) | **CIVIL ACTION NO. 08-cv-03359** |
| Plaintiff, ) ) | |
| vs. ) ) | CLASS ACTION COMPLAINT |
| ) | |
| MF GLOBAL LTD., MAN GROUP PLC, KEVIN R. DAVIS, AMY S. BUTTE, ALISON J. CARNWATH, CHRISTOPHER J. SMITH, CHRISTOPHER BATES, HENRI J. STEENKAMP and EDWARD L. GOLDBERG, ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendants. ) ) ) ) ) ) | |

Plaintiff, Michael J. Rudnick ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MF Global Ltd. ("MF" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of the common stock of MF, who purchased or otherwise acquired MF common stock pursuant or traceable to the Company's Initial Public Offering on or about July 19, 2007 (the "IPO" or the "Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.      MF is a broker of exchange-listed futures and options. It provides execution and clearing services for exchange-traded and over-the counter derivative products as well as for non-derivative foreign exchange products and securities in the cash market. Its accounts range from financial institutions, industrial groups, hedge funds and other asset managers to professional traders and private/retail clients.

3.      Since the time of its IPO, MF represented to investors and financial analysts that it had extensive and sufficient risk management procedures and internal controls.

4.      On February 28, 2008, however, the Company shocked investors when it announced that it would incur a $141.5 million loss as a result of unauthorized trades by one of its traders, later identified as Evan "Brent" Dooley ("Dooley").  The Company admitted that a failure in one of its retail order entry systems permitted the rogue trader to establish significant positions in his own account which were liquidated later that morning.  The following day, it was reported in *The Wall Street Journal* that the internal controls of the Company's systems were sometimes turned off at the Memphis office and possibly other locations in order to speed trades.

5.      In response to this news, shares of the Company's stock declined $8.09 per share, or 27.63 percent, to close on February 28, 2008 at $21.19 per share, on unusually heavy trading volume.  The Company's shares continued to fall the following day, declining an additional

$3.64 per share, or 17.18 percent, to close on February 29, 2008 at $17.55 per share. This closing price represented a cumulative loss of $12.45, or over 41 percent, of the value of the Company's shares at the time of its IPO just months prior.

6.      The Complaint alleges that, in connection with the Company's IPO, defendants failed to disclose or indicate the following: (1) that the Company lacked adequate risk management systems; (2) specifically, that the Company's order-entry systems were not operating in an efficient manner such that they were deemed ineffective; and (3) that the Company lacked adequate internal controls.

7.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

9.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v).

10.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act.  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, MF maintains an office located within this Judicial District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and

the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff, Michael J. Rudnick, as set forth in the accompanying certification, incorporated by reference herein, purchased MF common stock at artificially inflated prices during the Class Period and has been damaged thereby.

13.     Defendant MF is a Bermuda corporation with its principal executive offices located at Clarendon House, 2 Church Street, Hamilton, Bermuda.  Additionally, the Company maintains an office at 717 Fifth Avenue, 9th Floor, New York, New York.

14.     Defendant Man Group plc ("Man") is a former parent company of MF.

15.     Defendant Kevin R. Davis ("Davis") was, at all relevant times, the Company's Chief Executive Officer ("CEO"), and a member of the Company's Board of Directors.

16.     Defendant Amy S. Butte ("Butte") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and a member of the Company's Board of Directors.

17.     Defendant Alison J. Carnwath ("Carnwath") was, at all relevant times, the Company's Non-Executive Chairman of the Board of Directors.

18.     Defendant Christopher J. Smith ("Smith") was, at all relevant times, the Company's Chief Operating Officer ("COO"), Deputy Chief Executive Officer and a member of the Board of Directors.

19.     Defendant Christopher Bates ("Bates") was, at all relevant times, the Company's Group Controller.

20.     Defendant Henri J. Steenkamp ("Steenkamp") was, at all relevant times, the Company's Vice President of Corporate Financial Reporting.

21.     Defendant Edward L. Goldberg ("Goldberg") was, at all relevant times, a member

of the Company's Board of Directors.

22.    Defendants Davis, Butte, Carnwath, Smith, Bates, Steenkamp and Goldberg are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of MF's quarterly reports, press releases and documents, and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports, press releases and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

23.    MF is a broker of exchange-listed futures and options. It provides execution and clearing services for exchange-traded and over-the counter derivative products as well as for non-derivative foreign exchange products and securities in the cash market. Its accounts range from financial institutions, industrial groups, hedge funds and other asset managers to professional traders and private/retail clients.

24.    On July 18, 2007, the Company conducted its IPO.  In connection with the IPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement") with the SEC.  The IPO was a financial success for the Company, as it was able to raise $2.92 billion by selling 97.38 million shares of stock to the public at a price of $30 per share.

**Materially False and Misleading
<u>Statements Made in the Registration Statement</u>**

25.    Regarding the Company's risk management, the Registration Statement, in relevant part, stated:

> ***Overall, we believe that our exposure to market risk is substantially lower than it would be if we took positions for our own account primarily for directional purposes rather than primarily to facilitate client trades on a matched basis and to hedge and manage our corporate assets.*** However, for the reasons noted above, our trading practices do not eliminate market risk entirely, and we may incur trading losses from time to time. We cannot assure you that we will not incur significant losses at any time in the future, particularly in the event of severe market stress.
>
> *         *         *
>
> Our risk-management methods might not be effective, which could negatively impact our business.
>
> For us to manage the significant risks inherent in our business, we must maintain effective policies, procedures and systems that enable us to identify, monitor and control our exposure to market, credit, operational, legal and reputational risks. While we believe that our disciplined approach to risk management, and the diversified nature of our client risk exposures, help us to manage the risks in our business, our efforts to do so may not be effective. For a description of our risk-management systems, see "Our Business—Risk-Management". Our risk-management methods focus on monitoring each client's potential exposure at default – that is, our potential exposure to loss in the event that the client defaults – and adjusting that client's margin requirements accordingly in an effort to ensure that their collateral is sufficient to secure their performance obligations on their open positions.

This function requires, among other things, that we properly record and verify hundreds of thousands of transactions and events each day, and that we continuously monitor and evaluate the size and nature of our clients' positions and the associated risks. We must rely upon our analysis of information regarding markets, personnel, clients or other matters that are publicly available or otherwise accessible by us. That information may not in all cases be accurate, complete, up-to-date or properly analyzed. Further, we rely on a combination of technical and human controls and supervision that are subject to error and potential failure, the challenges of which are exacerbated by the 24-hour-a-day, global nature of our business. ***Our risk-management methods are based on internally developed controls, observed historical market behavior and what we believe to be industry practices. However, our methods may not adequately prevent future losses, particularly as they may relate to extreme market movements for which there is little historical precedent. Thus, our risk-management methods may prove to be ineffective because of their design, their implementation or the lack of adequate, accurate or timely information.*** If our risk-management efforts are ineffective, we could suffer losses that could have a material adverse effect on our financial condition or operating results. Additionally, we could be subject to litigation, particularly from our clients, and sanctions or fines from regulators.

\*       \*       \*

We actively manage risk on a global basis with a centralized, hands-on approach. Our senior executives play a leading role in managing our risk exposure on a day-to-day basis. We monitor our clients' open positions— which represent our principal risk exposure—and margin levels on a real-time basis, with both sophisticated technical systems as well as continuous oversight from our highly experienced risk managers. Client positions are reviewed and margin levels adjusted both during and at the end of each trading day. We do not rely primarily on conventional value-at-risk methodology to test our clients' exposures, as that methodology attempts to measure risk under relatively "normal" market conditions during a relatively brief period and may not always reflect significant "shock" events that may have occurred over a longer time frame. Rather, we stress-test client positions under hypothetical "worst-case" conditions that reflect actual historical data from periods extending back a decade or longer. We believe this approach enables us to measure risk in light of a broader range of historical experience that includes more extreme conditions. Equally important, we believe that effective risk-management requires a willingness to be selective about our

clients, in particular in terms of credit and risk analysis, and in some cases to limit our clients' trading activities. We believe that our value-added services and deep liquidity enable us to exercise a more disciplined approach to risk-management than would otherwise be the case if our client services were not as attractive to the market. We also believe that our primary focus on brokerage services and standardized products, and the fact that our trading markets tend to be relatively liquid with readily available pricing information, enable us to effectively evaluate and manage the risks posed by our clients' positions. In each of our last four fiscal years, our losses due to trading errors and client defaults have represented less than 2.0% of our revenues, net of interest and transaction-based expenses, with losses due solely to client defaults representing less than 0.5%.

*    *    *

***We could be harmed by employee or introducing broker misconduct or errors that are difficult to detect and deter***.

There have been a number of highly publicized cases involving fraud or other misconduct by employees of financial services firms in recent years. Unlike other firms that have incurred significant, well publicized losses of this kind in recent years, when we take positions for our own account, we do so primarily to execute client orders and not for directional purposes—i.e., not for the purpose of profiting from anticipated changes in market prices. We also take positions for our own account, when hedging our exposure in foreign currency and interest rates. ***We believe that limiting trades for our own account to matched-principal and hedging trades reduces the risk that our employees may execute trades for our account in excess of our exposure limits. Nevertheless, we are exposed to other risks relating to employee misconduct. Among other things, our employees could execute unauthorized transactions for our clients or for their own or any of our accounts, use client assets improperly or without authorization, carry out improper activities on behalf of clients or use confidential client or company information for personal or other improper purposes, as well as misrecord or otherwise try to hide improper activities from us.*** For example, we are currently subject to litigation and a regulatory investigation involving allegations of employee misconduct. See "Our Business—Legal Proceedings". Such exposures could be heightened in the case of private clients accounts for which our brokers, in limited circumstances, exercise discretionary authority.

In addition, employee errors, including mistakes in executing, recording or reporting transactions for clients, have in the past caused us to enter into transactions that clients disavowed and refused to settle, which could also occur in the future. Employee errors expose us to the risk of material losses until the errors are detected and the transactions are unwound or reversed. The risk of employee error or miscommunication may be greater for products that are new or have non-standardized terms. Further, such errors may be more likely to occur in the aftermath of any acquisitions during the integration of or migration from technological systems.

Misconduct by employees of our clients can also expose us to claims for financial losses or regulatory proceedings when it is alleged we or our employees knew or should have known that an employee of our client was not authorized to undertake certain transactions. Dissatisfied clients can make claims against us, including claims for negligence, fraud, unauthorized trading, failure to supervise, breach of fiduciary duty, employee errors, intentional misconduct, unauthorized transactions by associated persons and failures in the processing of transactions.

We could also be held responsible for improper conduct by our introducing brokers, even though we do not control their activities. Introducing brokers are futures brokers that maintain client relationships and delegate to us the responsibilities associated with trade execution, and back office operations. If an introducing broker effects trades through us that are unlawful, our regulators could hold us responsible if they were to conclude that we knew or should have known that the trades were unlawful. Moreover, a substantial number of our introducing brokers in the United States are "guaranteed" introducing brokers, meaning that we have agreed to use our capital to effectively guarantee their capital in exchange for their agreement to effect client trades exclusively through us. Under the Commodity Exchange Act, we are financially responsible for the obligations of our guaranteed introducing brokers, and we are also effectively responsible for their obligation to comply with the Commodity Exchange Act and the rules and regulations of the Commodity Futures Trading Commission.

Employee or introducing broker misconduct could subject us to financial losses or regulatory sanctions and seriously harm our reputation. We have an active program for monitoring and verifying that our employees and introducing brokers comply with specified procedures; however, it is not always possible to deter or detect employee or introducing broker misconduct, and the precautions we take to prevent and detect this activity may not be

effective in all cases. Our employees or introducing brokers may also commit good faith errors that could subject us to financial claims for negligence or otherwise, as well as regulatory actions

\*       \*       \*

### Risks Related to Our Operations and Technology

***If we experience systems interruptions, failures or capacity constraints, our ability to conduct our operations would be materially harmed.***

We are heavily dependent on the capacity and reliability of the computer and communications systems supporting our operations, whether owned and operated by us or by third parties. We receive and process a large portion of our trade orders through electronic means, including public and private communications networks. Rapid, reliable processing of orders is critical to our clients, since any delay or disruption can cause them significant financial losses. If our clients become concerned about the reliability of our systems, they could quickly take their business to our competitors. Further, any upgrades or expansions may require significant expenditures of funds and may also increase the probability that we will suffer system degradations and failures.

Our computer and communications systems could slow down, malfunction or fail for a variety of reasons, including loss of power, vendor or network failure, acts of war or terrorism, human error, natural disasters, fire, sabotage, hardware or software malfunctions or defects, computer viruses, heavy stress placed on our systems during peak trading times, intentional acts of vandalism, client error or misuse, lack of proper maintenance or monitoring and similar events. For example, during the terrorist attacks on the World Trade Center on September 11, 2001, we lost access to a significant portion of our communications and computer networks in New York and had to rely on our backup systems. Our systems could also fail in the event of a sudden, unpredicted surge in trading volume, such as could occur in times of severe market stress. Many of these risks are beyond our control.

\*       \*       \*

### Risk Management

***We believe that effective risk-management is critical to the success of our business. Consequently, we devote significant resources (including investments in employees and technology)***

*to the measurement, analysis and management of risk. We employ 125 professionals in our compliance, risk-management and credit risk operations worldwide.*

*We have established a robust, globally integrated risk-management infrastructure to monitor, evaluate and manage the principal risks we assume in conducting our business around the world.* While Man Group has historically provided us with corporate-level oversight of our global risk-management operations, following this offering, we intend to manage our global risk-management activities on a stand-alone basis with our own personnel. Pursuant to a transitional risk services agreement with Man Group, Man Group has agreed to provide us with a license to use of a copy of the global risk-management systems and processes that will enable us, among other things, to calculate our economic capital, conduct stress-testing of our business, prepare reports supporting documentation requirements, prepare annual liquidity scenarios and test our liquidity contingency plan. For a discussion of the group risk services agreement, see "Certain Relationships and Related Transactions—Group Risk Services Agreement".

*As part of this transition, we employ a dedicated Chief Risk Officer who is responsible for overseeing all aspects of our risk-management infrastructure and who reports directly to our Chief Operating Officer and Deputy CEO. On a day to day basis, he manages and oversees specialist teams that continuously monitor our risk exposures around the world.* These teams communicate their findings to him and to local decision-making bodies to allow us to react rapidly to address any developing risks. The Chief Risk Officer is responsible for preparing periodic global risk reports that are presented to our Global Risk Committee, which in turn reports to our Audit Committee. These reporting measures are designed to ensure that various levels of management communicate with one another regarding the evolving risks affecting our business. In addition, each business manager is required to measure and submit reports periodically to the Chief Risk Officer, who in turn reports to the Global Risk Committee, regarding its Key Risk Indicators, in a mandatory format that covers a wide range of comparative measurements, including settlement and bank account reconciliation items, error accounts and failed trades, brokerage receivables, margin calls, credit limits, personnel turnover, client complaints and infrastructure interruptions. The Key Risk Indicator reporting process, together with our other reporting processes, are designed to enable us to assess the levels of risk present throughout our operating environment on a real-time basis and to take any necessary remedial action in a timely manner. [Emphasis added.]

26.    The statements contained in ¶ 25 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company lacked adequate risk management systems; (2) specifically, that the Company's order-entry systems were not operating in an efficient manner such that they were deemed ineffective; and (3) that the Company lacked adequate internal controls.

### **The Truth Begins to Emerge**

27.    On February 28, 2008, MF issued a press release entitled "MF Global Announces $141.5 Million Bad Debt Provision."  Therein, the Company, in relevant part, stated:

> *MF Global (NYSE: MF), a leading broker of exchange-traded futures and options, announced that during the early hours of Wednesday morning, February 27, a registered representative in one of its U.S. branch offices, trading in the wheat futures market in his personal account, substantially exceeded his authorized trading limit.* The registered representative concerned has been terminated effective immediately.

> *A failure in one of the company's retail order entry systems permitted the representative to establish significant positions in his own account which were liquidated later that morning. The unauthorized activity resulted in him incurring a loss of $141.5 million, which the company, as a clearing member, is responsible to settle at the clearinghouse. As a result, the company recorded a bad debt provision for the full amount.*

> *The company believes it has made the appropriate adjustments to its order entry systems to prevent a recurrence of unauthorized trading of this type in the future. In addition, MF Global has engaged a third-party risk technology consultant to review its relevant order entry systems.*

> Client funds are not at all impacted by this event.

> The company's capital and liquidity position remain strong. The loss represents approximately six percent of the company's equity, in addition to which it has close to $1.5 billion in undrawn committed credit facilities.

> In the company's fourth fiscal quarter to date, net revenues are exceeding all comparable prior periods of this fiscal year. MF

Global remains confident in its business prospects and long-term
financial performance. [Emphasis added.]

28.    Upon the release of this news, shares of the Company's stock declined $8.09 per
share, or 27.63 percent, to close on February 28, 2008 at $21.19 per share, on unusually heavy
trading volume.  This closing price on February 28, 2008 represented a cumulative loss of $8.81,
or over 29 percent, of the value of the Company's shares at the time of its IPO just months prior.

29.    Then, on February 29, 2008, The Wall Street Journal published an article entitled
"Safety Net Breaks Again --- Wheat-Price Bets Lead To Big MF Global Loss Despite Risk
Controls."  Therein, the article, in relevant part, stated:

> *It took only seven hours early Wednesday for a trader at MF
> Global Ltd. to make bad bets on the direction of wheat prices that
> cascaded into $141.5 million in losses at the brokerage firm and
> exposed another breakdown in Wall Street's risk management.*
>
> *Yesterday's announcement of the ill-fated trades was an
> embarrassment for the Bermuda-based futures and derivatives
> firm, which suffered a 28% drop in its share price. It was the
> steepest decline since MF Global was spun off last year from
> hedge-fund giant Man Group PLC, and the blowup raised
> questions about how one of the largest customers on several
> futures exchanges could have left itself so exposed to a single
> trader's bets.*
>
> *MF Global identified the trader as Evan Dooley, who worked in
> the firm's Memphis, Tenn., office until he was fired for having
> "substantially exceeded his authorized trading limit."*
>
> *In an interview, the 40-year-old Mr. Dooley, who goes by his
> middle name, Brent, blamed the trading loss on the computer
> systems he was using. That system "failed on a lot of things," he
> said, including problems in "setting limits." He declined to be
> more specific.*
>
> MF Global insisted that the breakdowns resulting in the steep loss
> were isolated and have been fixed. *But Kevin Davis, the
> brokerage's chief executive, acknowledged that existing internal
> controls could have stopped Mr. Dooley's trades from being
> processed -- but were turned off in a few cases to allow for*

*speedier transactions by brokers at the firm who traded for themselves or took customer orders by phone.*

"This is an absolutely awful event, but we believe it was an aberration in our risk controls. We believe that we have fixed it," Mr. Davis said. The firm has hired FTI Consulting Inc., of Baltimore, to review its risk-management procedures.

Mr. Dooley, who has spent more than 15 years in the rough-and-tumble business of commodities trading, had just one customer, and that person hadn't done any trading business with Mr. Dooley in "some time," Mr. Davis said. But the trader was allowed to process trades for his own account through MF Global, which collected commissions on those transactions. Such arrangements are common in futures trading, even though the brokerage firms essentially must use their own capital if traders can't afford outsize bets that go wrong.

Mr. Dooley, who joined the firm in November 2005, was betting that wheat prices would fall from their recent highs, according to a person familiar with the situation. Wheat and other commodities have surged in recent weeks because of strong demand, tight supply and a cash infusion from investors.

Mr. Dooley entered into the trades between midnight and 7 a.m. Eastern time Wednesday, according to the company, which said he placed orders for about 15,000 to 20,000 futures contracts, including March contracts and "a number of other contracts."

The trades weren't made from the brokerage firm's Memphis office. Mr. Dooley often traded from his home in Olive Branch, Miss., where he lives with his wife, according to Mr. Dooley's father, Evan Dooley. "He's not a big trader. He's not a rogue trader," said Mr. Dooley after speaking with his son several times yesterday. "He's a day trader. If he made $1,000 a day, that was a good day."

*MF Global's risk-management procedures include "buying power controls" that are supposed to flag big or risky trades that might expose the firm to potential losses. But those internal controls were sometimes turned off at the Memphis office and possibly other locations in order to speed trades.* The surge in commodities-trading volume has created pressure on brokerage firms to keep up.

CME Group Inc.'s Chicago Board of Trade handled Mr. Dooley's orders. By Wednesday morning, though, wheat prices were

moving sharply higher, meaning that Mr. Dooley was suffering losses that far exceeded the balance in his own trading account. Since his account was depleted, MF Global was forced to step in and fund the trader's losing position.

*"It happened very quickly," Mr. Davis said in a conference call. Mr. Dooley didn't have the capital "to support even a fraction of his positions."*

Some said MF Global's buying binge pushed wheat prices higher and fueled heavy trading Wednesday. It took several hours to undo Mr. Dooley's trades, but Mr. Davis played down their role in price moves. Floor trading of futures occurs in the daytime, while electronic trading through CME is during the day and from 6 p.m. to 6 a.m. Central time.

The MF Global mess was "certainly the main thing" that caused the market to gyrate Wednesday, said Vic Lespinasse, analyst for Illinois Grain. The most actively traded May wheat contract surged by the CBOT-imposed limit of $1.35 a bushel.

Covering Mr. Dooley's positions cost MF Global $141.5 million in cash, or about $80 million on an after-tax basis. That is equal to about 6% of the brokerage firm's capital -- and exceeds the company's net income in the fiscal third quarter ended Dec. 31.

Some of the loss might be recovered from insurance companies or mitigated by reduced bonuses at the firm, but getting the money from Mr. Dooley isn't likely. The trader "doesn't appear to be terribly long of assets," Mr. Davis said.

National Futures Association records show no prior regulatory problems for Mr. Dooley. It isn't clear if he will face disciplinary action from regulators stemming from his wheat-futures trades. The Commodity Futures Trading Commission, which regulates U.S. futures markets, is looking into the situation. In a statement, the CFTC said the problem "appears to be an isolated event."

Outside of work, Mr. Dooley liked to go fishing, according to his father. Richard Gunter, who lives across the street from a brick house in Eads, Tenn., where Mr. Dooley used to live, recalls seeing the trader leave for work around 6 a.m. or 6:30 a.m. With the rise of electronic trading, though, Mr. Dooley could trade nearly 24 hours a day.

*MF Global's shares fell $8.09, or 28%, to $21.19 yesterday in 4 p.m New York Stock Exchange composite trading. That was the*

*steepest decline since the company went public at $30 a share.*
[Emphasis added.]

30.    Upon the release of this news, shares of the Company's stock declined $3.64 per share, or 17.18 percent, to close on February 29, 2008 at $17.55 per share, on unusually heavy trading volume.  This closing price represented a cumulative loss of $12.45, or over 41 percent, of the value of the Company's shares at the time of its IPO just months prior.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired MF's common stock pursuant or traceable to the Company's July 19, 2007 IPO, and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

32.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, MF's common stock was actively traded on the New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by MF or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of

federal law that is complained of herein.

34.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of MF; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

36.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**<u>UNDISCLOSED ADVERSE FACTS</u>**

37.    The market for MF's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, MF's common stock traded at artificially inflated prices during the Class Period.

Plaintiff and other members of the Class purchased or otherwise acquired MF's common stock relying upon the integrity of the market price of MF's common stock and market information relating to MF, and have been damaged thereby.

38.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of MF's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

39.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about MF's operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of MF and its operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

40.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

41.    During the Class Period, Plaintiff and the Class purchased common stock of MF

at artificially inflated prices and were damaged thereby. The price of MF's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

### Applicability of Presumption of Reliance:<br>Fraud On The Market Doctrine

42.    At all relevant times, the market for MF's common stock was an efficient market for the following reasons, among others:

    (a)    MF's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    (b)    As a regulated issuer, MF filed periodic public reports with the SEC and the NYSE;

    (c)    MF regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    (d)    MF was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

43.    As a result of the foregoing, the market for MF's common stock promptly digested current information regarding MF from all publicly-available sources and reflected such information in MF's stock price. Under these circumstances, all purchasers of MF's common

stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

44.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements, because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of MF who knew that those statements were false when made.

### FIRST CLAIM
### Violation of Section 11 of
### The Securities Act Against All Defendants

45.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Registration Statement.

46.    This claim is asserted by Plaintiff against all defendants by, and on behalf of,

persons who acquired shares of the Company's common stock pursuant to or traceable to the false Registration Statement issued in connection with the July 19, 2007 IPO.

47.    Individual Defendants as signatories of the Registration Statement, as directors and/or officers of MF and controlling persons of the issuer, owed to the holders of the stock obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein.  As such, defendants are liable to the Class.

48.    None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

49.    Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

50.    As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of MF's common stock sold in the IPO was artificially inflated, and Plaintiff and the Class suffered substantial damage in connection with their

ownership of MF's common stock pursuant to the Registration Statement.

51.    MF is the issuer of the stock sold <u>via</u> the Registration Statement.  As issuer of the stock, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

52.    At the times they obtained their shares of MF, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

53.    This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

54.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

**SECOND CLAIM**
**Violation of Section 12(a)(2) of**
**<u>The Securities Act Against All Defendants</u>**

55.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all defendants.

57.    Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the MF Offering Registration Statement.

58.    The MF IPO Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  The Individual Defendants' actions of solicitation included

participating in the preparation of the false the misleading Registration Statement.

59.    Defendants owed to the purchasers of MF's common stock, including Plaintiff and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the IPO materials, including the Registration Statement, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

60.    Plaintiff and other members of the Class purchased or otherwise acquired MF's common stock pursuant to and/or traceable to the defective Registration Statement.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

61.    Plaintiff, individually and representatively, hereby offer to tender to defendants that common stock which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such common stock, in return for the consideration paid for that common stock together with interest thereon.  Class members who have sold their MF common stock are entitled to rescissory damages.

62.    By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold MF common stock purchased in the IPO have the right to rescind and recover the consideration paid for their MF common stock, and hereby elect to rescind and tender their MF common stock to the defendants sued herein.  Plaintiff and Class members who have sold their MF common stock are entitled to rescissory damages.

63.    This action is brought within three years from the time that the common stock upon which this Count is brought was sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

### THIRD CLAIM
**Violation of Section 15 of The Securities Act**
**Against the Individual Defendants**

64.    Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 15 claim, including without limitation, scienter.

65.    This count is asserted against Individual Defendants and is based upon Section 15 of the Securities Act.

66.    Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of MF within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause MF to engage in the acts described herein.

67.    Individual Defendants' position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

68.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class

members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 4, 2008

Respectfully submitted,

**BRODSKY & SMITH, LLC**

By:_Evan J. Smith, Esquire (ES3254)_
Evan J. Smith, Esquire (ES 3254)
240 Mineola Boulevard
Mineola, NY 11501
(516) 741-4977
(516) 741-0626 (facsimile)

**SCHIFFRIN BARROWAY
TOPAZ & KESSLER LLP**
Richard A. Maniskas, Esquire
Seamus Kaskela, Esquire
David Promisloff, Esquire
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056

*Attorneys for Plaintiffs*